George **MILLER** et al.

v.

**Ernest SZELENYI** et al.

Supreme Judicial Court of Maine.

Argued May 3, 1988.

Decided Aug. 26, 1988.

John F. Shepard, Jr. (orally), Shepard & Shepard, Freeport, Thomas Connolly, Portland, for plaintiffs.

Christopher D. Nyhan (orally), Geoffrey K. Cummings, Preti, Flaherty, Beliveau & Pachios, Portland, for Ernest Szelenyi.

James. E. Tierney, Atty. Gen., Linda Siberty Crawford (orally), Asst. Atty. Gen., Augusta, for defendants.

Before McKUSICK, C.J., and
ROBERTS, WATHEN, GLASSMAN,
SCOLNIK* and CLIFFORD, JJ.

GLASSMAN, Justice.

The defendant, Ernest Szelenyi, M.D., appeals from a judgment of the Superior Court, Cumberland County, entered on a special jury verdict finding that Szelenyi, by his gross negligence, had caused the wrongful death of Therese Miller and awarding damages in the amount of $260,-000 to George Miller, as personal representative of Therese Miller's estate. The plaintiffs, George Miller, individually and as personal representative of his wife's estate, and their three adult daughters, cross-appeal from the Superior Court's order directing a verdict against them on their additional claims against both Szelenyi and the four additional defendants, Robert Scarlata, M.D., George Zitnay, Robert Welch, and Kevin Concannon (supervisory defendants).[1] We affirm the judgment.

### Background

Plaintiffs' original and amended complaint alleged the following claims: First, a wrongful death claim by George Miller as

---

* Scolnik, J., sat at oral argument and participated in the initial conference but retired before this opinion was adopted.

1. Ernest Szelenyi was an on-call physician at the Benda Hospital of the Pineland Center, a state facility for the mentally handicapped. Dr. Robert Scarlata was the Clinical Director at the Pineland Center, George Zitnay was the Superintendent of the Pineland Center, Robert Welch was Director of the Bureau of Mental Retardation, and Kevin Concannon was Commissioner of the former Department of Mental Health and Corrections (now called the Department of Mental Health and Mental Retardation, 34–B M.R.S.A. § 1201 (1988)).

the personal representative of Therese Miller's estate pursuant to 18–A M.R.S.A. § 2–804 (1981 & Supp.1987) against all five defendants, seeking compensatory and punitive damages. Second, a claim against all five defendants on behalf of the decedent's estate seeking compensatory and punitive damages for the deprivation of Therese Miller's life and by the plaintiffs individually against Szelenyi for their asserted right to consortium and companionship with Therese Miller, all pursuant to 42 U.S.C. § 1983 (1981), as violations of the due process clause of the fourteenth amendment. Third, a claim against all five defendants for the negligent infliction of plaintiffs' mental and emotional distress. In addition, although not contained in the pleadings, plaintiffs by a trial brief filed eight days before trial sought compensatory and punitive damages under section 1983 for a conspiracy among all the defendants to conceal the facts surrounding Mrs. Miller's death.

Prior to trial, the Superior Court, *inter alia*, 1) granted the defendants' motion to dismiss the claims for plaintiffs' emotional and mental distress and for punitive damages; 2) denied Szelenyi's motion to dismiss the wrongful death claim for lack of notice under the Maine Tort Claims Act (MTCA), 14 M.R.S.A. § 8107(1) (1980); and 3) denied the supervisory defendants' motion to dismiss the section 1983 claims against them.[2] The Superior Court also denied Szelenyi's subsequent motion requesting summary judgment on the section 1983 claims against him.

After five days of trial, and over the plaintiffs' objection, the Superior Court bifurcated the issues and the defendants in this case. In Phase I the jury heard evidence relating only to the wrongful death action of George Miller, as personal representative of the decedent's estate, against Dr. Szelenyi pursuant to 18–A M.R.S.A.

§ 2–804 (1981 & Supp.1987).[3] The jury returned a special verdict against Szelenyi at the close of Phase I finding him grossly negligent and awarded damages in the amount of $260,000. In Phase II the jury heard the plaintiffs' evidence on the wrongful death claim against the four supervisory defendants and the section 1983 actions against all five defendants. At the close of the plaintiffs' evidence in Phase II, the Superior Court granted the defendants' motions for a directed verdict.

### I. *Szelenyi's Appeal from Phase I*

In Phase I of the trial, the jury heard the following evidence: On January 29, 1983 at about 6:40 a.m. Therese Miller collapsed while on duty as a nurse's aide at the Benda Hospital of the Pineland Center. Within one minute of her collapse Darlene Turner, R.N., had started cardio-pulmonary resuscitation (CPR). Within another minute or two, nurses Doris Babbidge and Arlene Sprague also arrived on the scene. An ambulance from Gray Ambulance Service was immediately called to transport Mrs. Miller to the Maine Medical Center, which had much better emergency facilities. At this point she was not breathing on her own and she had no carotid pulse. Nevertheless, her pupils responded to light indicating that her brain still retained oxygen. At some point several minutes into the resuscitation effort Mrs. Miller took several breaths on her own. While CPR was being continued, Babbidge wheeled up a "crash cart" that contained a defibrillator, or electric shock machine, used to facilitate CPR.

Dr. Szelenyi arrived on the scene 10 or 15 minutes after Mrs. Miller's collapse. Szelenyi's shift as an on-call physician at the hospital was due to end at 8 o'clock that morning, and Szelenyi had been asleep just prior to the emergency. For the most part, Szelenyi simply watched the resusci-

---

**2.** The Superior Court also dismissed all claims against the State of Maine, which had been named as a defendant. The plaintiffs do not challenge that ruling on appeal.

 Neither Szelenyi nor the supervisory defendants moved to dismiss the section 1983 conspiracy claim because plaintiffs had not yet asserted the claim at that time.

**3.** Prior to the bifurcation order, plaintiffs had put on evidence relating only to the wrongful death action against Szelenyi. Plaintiffs do not challenge the court's bifurcation of issues and defendants.

tation effort from the nurses station. He did, however, 1) pronounce Mrs. Miller dead "within a matter of minutes" from his arrival and without any genuine physical examination of her, 2) prevent any use of the electric shock machine, stating his insurance did not cover his treatment of Pineland employees, and 3) urge that she be moved to a bed, though CPR, which requires a hard surface, was still being performed. The Gray ambulance arrived 35 or 40 minutes after Mrs. Miller's collapse. At Maine Medical Mrs. Miller was defibrillated and she momentarily regained a voluntary heartbeat, but was eventually pronounced dead.

Szelenyi's deposition was read *in toto* to the jury in lieu of his in-court testimony. In his deposition Szelenyi maintains that the defibrillator was never required because Therese Miller was dead "before she went down from the chair." Moreover, he stated he did not "even think about" insurance, let alone prevent use of the defibrillation machine on that basis. Szelenyi put on only one witness, nurse Arlene Sprague. Sprague testified that she did not recall Szelenyi making any reference to insurance.

### A. *Jury Selection*

■ Szelenyi first contends that the Superior Court abused its discretion in denying his motion for a mistrial. During jury selection voir dire, the court inquired if any panel member had ever been employed at a state mental institution or prison. Panel member number 86 stated that she had done consulting work at both the Augusta Mental Health Institute and the Pineland Center. Later the panel was asked whether any one of them had ever experienced serious dissatisfaction with his own medical treatment and, if so, would it be difficult to remain fair and impartial in the case at hand. In response, number 86 indicated that it would be difficult for her to remain impartial because she and her family had

"a lot of problems in communication [with doctors]," and that she had "been [i.e., worked] in institutions similar to Pineland and ... [had] a somewhat jaded view of physicians that have been hired in institutions." Szelenyi moved for a mistrial based upon the prejudicial effect of number 86's statements on the other panel members.

We review the Superior Court's ruling on a motion for mistrial only for an abuse of discretion. *Brubach v. Almy*, 520 A.2d 334, 340 (Me.1987). *Olsen v. French*, 456 A.2d 869, 876 (Me.1983). Here, the Superior Court did not abuse its discretion. Following the motion for mistrial number 86 was asked no further questions in open court. At a chambers conference with counsel present, number 86 recounted her answers given in open court[4] and stated that she had not discussed her views in private with other panel members. Thereupon, the trial court excused number 86 from future service on the case. Unlike the panel member in *Woolley v. Henderson*, 418 A.2d 1123, 1127 (Me.1980), on being excused number 86 did not remain in the courtroom or answer additional questions in open court. Moreover, the court specifically asked the remaining panel members whether number 86's statements had influenced them or would prevent any of them from being fair and impartial. There was no response, and the court told the panel that he understood the silence to mean there was no problem. Thus, the "composite inference" (*id.*) here is that there was no resulting prejudice, and the denial of the mistrial was not an abuse of discretion.

### B. *Opening and Closing Statements*

■ Szelenyi next claims that plaintiffs' counsel improperly discussed facts not in evidence and gave his personal opinion of the evidence. Szelenyi's first argument is directed primarily to the opening statement

---

4. Number 86 was asked to recount her open-court answers in chambers because it was believed that the court reporter may have failed to hear and record accurately all that number 86 had said. It remained unclear whether her reference to her family's problem communicating with institutional doctors related to the institutionalization of her brother or her grandmother, or both.

of plaintiffs' counsel in which he referred to an alleged cover-up by the supervisory defendants designed to prevent dissemination of the facts surrounding Mrs. Miller's death. Immediately following the opening statement, Szelenyi's counsel objected and requested a curative instruction. The court overruled the objection and no curative instruction was given.

The trial court has discretion to determine both the prejudicial effect of any claimed improper conduct by counsel and what corrective measures should be taken. *Minott v. F.W. Cunningham & Sons*, 413 A.2d 1325, 1333 (Me.1980). In an opening statement counsel should properly outline for the jury only evidence that he intends in good faith to introduce and that he reasonably believes will be admitted. 75 *Am. Jur.2d* Trial §§ 208, 209 (1974); *Smith v. Covell*, 100 Cal.App.3d 947, 959, 161 Cal. Rptr. 377, 384 (1980); *Schwedler v. Galvan*, 46 Ill.App.3d 630, 639–640, 4 Ill.Dec. 891, 898, 360 N.E.2d 1324, 1331 (1970). Here, the trial court had provisionally ruled that the plaintiffs' claim of conspiracy could remain in the case.[5] It was only after several days of trial of the plaintiffs' case, but before any evidence of conspiracy had been offered, that the court ruled finally that the conspiracy issue had been untimely raised and evidence concerning it would not be permitted. Plaintiffs' counsel could not have foreseen this ruling. The trial court properly exercised its discretion in refusing to give a curative instruction at the time it was requested by Szelenyi.

■ Szelenyi also argues that plaintiffs' counsel improperly commented on the evidence during closing statement. Counsel may comment on evidence at trial if such commentary is "within [the] bounds of fairness." *Young v. Carignan*, 152 Me. 332, 338, 129 A.2d 216, 219 (1957). Szelenyi did not object at trial, and we review the issue only for obvious error. M.R.Evid. 103(d). Our review of the record does not indicate that the contested remarks were so prejudicial as to affect Szelenyi's substantial

rights. *See, e.g., Werner v. Lane*, 393 A.2d 1329, 1332–33, 1338 (Me.1978) (trial court should have *sua sponte* corrected defense counsel's charge that plaintiff's case was a "fraud" and a "bingo game").

### C. *Insurance Evidence*

■ Szelenyi next claims that the Superior Court improperly denied his motion *in limine* to exclude all references to his insurance coverage. This contention requires us to construe M.R.Evid. 411 to determine what discretion the trial court has under the rule to admit or exclude evidence of lack of insurance. By denying Szelenyi's motion *in limine,* the trial court ultimately allowed in evidence Szelenyi's testimony that he directed that Mrs. Miller not be defibrillated because his malpractice insurance did not cover his treatment of Pineland employees. We hold that under the unusual facts of this case the court's ruling admitting evidence of Szelenyi's lack of insurance was not an abuse of its discretion.

■ Rule 411 states that "[e]vidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully." The rule, which became effective in 1976, is "in accord with Maine law." M.R.Evid. 411 advisers' note, *reprinted in* Field & Murray, *Maine Evidence* 135 (1987). Pre-rule Maine case law, cited in the advisers' note, recognizes that the prohibition against insurance evidence is not absolute, that the "[d]ecision of whether to permit it ... must repose in the discretion of the presiding Justice, guided by the general standard that it is to be avoided unless extraordinary special circumstances require it." *Duguay v. Pomerleau*, 299 A.2d 914, 916 (Me.1973). The advisers' note to Rule 411 explicitly recognizes the trial court's discretion to admit or exclude insurance evidence when that evidence is relevant for a purpose other than the issue of liability. M.R.Evid. 411 advisers' note, *reprinted in* Field & Murray,

---

**5.** The status of the plaintiffs' claim of a conspiracy to cover up facts surrounding Mrs. Miller's death was in question because plaintiffs had not raised the issue in their original or amended complaints. Rather, they had raised it in a trial brief submitted eight days prior to trial.

*Maine Evidence* 135 (1987). Even when insurance evidence may affect the issue of liability, however, we do not read Rule 411 as a flat prohibition admitting of no discretion whatsoever. Rather, Rule 411 is a codification of the "general standard" that insurance evidence should be excluded, unless "extraordinary special circumstances require it." *Duguay*, 299 A.2d at 916.

The trial court denied the motion *in limine* and admitted the evidence apparently on the theory that the evidence was admissible for another purpose other than liability in that it explained or provided a motive for Szelenyi's action or lack of action. The court instructed the jury that it could consider the evidence in order "to understand the motivation of the parties," but not to determine "whether or not somebody is responsible because he might have insurance or might not have insurance." At that time, the court had not bifurcated the case. Thus, the jury could properly consider this evidence in connection with the plaintiffs' section 1983 claims, for which they sought punitive damages. Whether punitive damages should be awarded depends largely on the defendant's motive. *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me.1985). Accordingly, the trial court did not abuse its discretion by denying Szelenyi's motion *in limine*.

### D. *Prior Negligent Acts*

■ We find no merit in Szelenyi's contention that the court erred in admitting evidence of Szelenyi's prior negligent acts. Because all of the challenged evidence was admitted in Phase II and could have had no impact on the jury's verdict in Phase I, there was no reversible error in the admission of the evidence.

### E. *Maine Tort Claims Act*

■ Finally Szelenyi contends that the court erred in denying his motion for a directed verdict on the wrongful death action against him for lack of notice to him as required by the Maine Tort Claims Act, 14 M.R.S.A. § 8107(1) (1980).[6] When reviewing the denial of a motion for directed verdict, we determine whether the verdict can be sustained by any reasonable view of the evidence, taken in the light most favorable to the party in whose favor the verdict was rendered. *Buchanan v. Martin Marietta Corp.*, 494 A.2d 677, 678 (Me.1985); *Cyr v. Michaud*, 454 A.2d 1376, 1379–80 (Me.1983).

Notice under section 8107 of the Tort Claims Act is required only if the defendant is a governmental entity or governmental employee.[7] The Act defines employee as follows:

> a person acting on behalf of the governmental entity in any official capacity ... but the term "employee" shall not mean a person or other legal entity acting in the capacity of an independent contractor under contract to the governmental entity.

14 M.R.S.A. § 8102(1) (1980). Here the only evidence introduced in Phase I on the issue of Szelenyi's employment status would support a finding that Szelenyi was an independent contractor, not a state employee. Szelenyi's one-year contract states, *inter alia*, that the agreement is between the State of Maine

> and Ernest Szelenyi, M.D. hereinafter called "Contractor." The type of organization of the Contractor is ... an individual doing business as Ernest Szelenyi,

---

**6.** Also on the lack of notice grounds under M.R. Civ.P. 12(b)(6) Szelenyi had moved to dismiss the wrongful death claim against him. Szelenyi's motion to dismiss, which became a motion for summary judgment when the court considered interrogatories and affidavits outside the pleadings (M.R.Civ.P. 12(b)), was denied because the court held that a material factual issue remained as to the date of the accrual of the cause of action.

**7.** 14 M.R.S.A. § 8107 (1980) reads in pertinent part:

**1. Notice requirements for filing.** Within 180 days after a cause of action against a governmental entity accrues, or at a later time within the limits of section 8110, when a claimant shows good cause why notice could not have reasonably been filed within the 180–day limit, a claimant or his personal representative shall file a written notice containing:

. . . .

C. The name and address of any governmental employee involved, if known. . . .

M.D. ... [t]he parties hereto agree that the Contractor, and any agents and employees of the Contractor, ... shall act in an independent capacity and not as officers or employee or agents of the State. In his deposition, read *in toto* to the jury, Szelenyi states: "I was not a State employee anymore, a regular. I was on contract as a private doctor." Thus, the court properly denied Szelenyi's motion for a directed verdict.

## II. *Plaintiffs' Cross–Appeal*

Following the successful wrongful death action against Szelenyi in Phase I, there remained for trial in Phase II both a continuation of the wrongful death action under 18–A M.R.S.A. § 2–804 against the supervisory defendants for the alleged improper hiring, retaining and supervising of Szelenyi, and the section 1983 claims. At the close of the plaintiffs' case in Phase II the court granted both Szelenyi's and the supervisory defendants' motions for a directed verdict.

### A. *Emotional and Mental Distress*

■ Plaintiffs first contend that the trial court erred by dismissing their claim for damages for the defendants' negligent infliction of emotional and mental distress. We affirm the court's dismissal of the claim. Our review of the record as it appeared before the pretrial court reveals no factual basis for the individual plaintiffs to recover for any emotional or mental distress caused by the death of Mrs. Miller. Nor do the plaintiffs have any right of recovery for emotional and mental distress under section 2–804. The wrongful death act created a right of action where none may have existed at common law. *Carrier v. Bornstein*, 136 Me. 1, 2, 1 A.2d 219, 220 (1938). Statutes in derogation of the common law are strictly construed. *Emery Waterhouse Co. v. Lea*, 467 A.2d 986, 996

(Me.1983); *Chase v. Town of Litchfield*, 134 Me. 122, 129, 182 A. 921, 925 (1936). The injuries for which recoverable damages may be granted on a claim for wrongful death, as set forth in 18–A M.R.S.A. § 2–804(b) (Supp.1987), do not include emotional and mental distress. *See Carrier v. Bornstein*, 136 Me. at 2–3, 1 A.2d at 220 (denying damages for "any distress of mind" under 1933 version of the Act). On this record, the court properly dismissed plaintiffs' claim for damages based on the plaintiffs' emotional and mental distress because of the death of Therese Miller.

### B. *Wrongful Death Claims Against the Supervisory Defendants*

In Phase II of the trial the court directed a verdict in favor of the supervisory defendants Concannon, Zitnay and Scarlata on the wrongful death claims against them by the plaintiff George Miller, as a personal representative. We reject the plaintiff's cross-appeal from that directed verdict on the separate ground that, pursuant to 14 M.R.S.A. § 8111(1)(C) (1980 & Supp.1987),[8] those defendants are immune from liability in the circumstances here presented.

In Phase II, the theory of liability against the supervisory defendants for Mrs. Miller's wrongful death was that they improperly hired, retained and supervised Szelenyi with knowledge of the foreseeable risk that Szelenyi posed to those subject to his treatment at Pineland. At the close of the plaintiff's evidence, the Superior Court, finding that the plaintiff's evidence could not sustain a jury verdict, directed a verdict for the defendants.

Immunity under section 8111(1)(C) is an affirmative defense. *Cunningham v. Haza*, 538 A.2d 265, 267 (Me.1988); *MacKerron v. Madura*, 474 A.2d 166, 167 (Me. 1984); *see also Robinson v. Washington County*, 529 A.2d 1357, 1360–61 (Me.1987) (governmental immunity is an affirmative

---

**8.** Title 14 M.R.S.A. § 8111(1)(C) reads:

 1. **Immunity.** Employees of governmental entities shall be personally immune from civil liability for the following:

 ....

 C. The performance or failure to exercise or perform a discretionary function or duty,

whether or not the discretion is abused; and whether or not the statute, charter, ordinance, order, resolution, regulation or resolve under which the discretionary function or duty is performed is valid.

defense). We review the evidence, including every justifiable inference therefrom, in the light most favorable to the plaintiff to determine whether a jury verdict for the plaintiff could be sustained. *See Baker v. Mid Maine Medical Center,* 499 A.2d 464, 466 (Me.1985); *see also Ward v. Cumberland County Power & Light Co.,* 134 Me. 430, 432–33, 187 A. 527, 528 (1936) (upholding directed verdict in favor of defendant's affirmative defense). State employees are protected by section 8111(1)(C) if they have been legislatively authorized to perform a discretionary function or duty, and if they have acted, or failed to act, pursuant to that authorization. *Darling v. Augusta Mental Health Inst.,* 535 A.2d 421, 425 (Me.1987); *True v. Ladner,* 513 A.2d 257, 260 (Me.1986). Discretionary function immunity requires that the contested actions must be essential to the realization or accomplishment of a basic governmental policy, program or objective. *Darling,* 535 A.2d at 426; *see also Dalehite v. United States,* 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427, 1441 (1953) ("Where there is room for policy judgment and decision there is discretion"); *cf. Bergmann v. United States,* 689 F.2d 789, 791–97 (8th Cir.1982) (selection and supervision of federally protected witness is discretionary function under Federal Tort Claims Act); *Taxay v. United States,* 345 F.Supp. 1284, 1286 (D.D.C.1972) (decision not to recertify plaintiff as Aviation Medical Examiner is discretionary function under F.T.C.A.), *aff'd,* 487 F.2d 1214 (D.C.Cir.1973).

Under 34 M.R.S.A. § 1 (1978)[9] Commissioner Concannon was charged with *"general* supervision, management and control of the ... officers and employees ... of the ... Pineland Center." (emphasis added).[10] Similarly, Superintendent Zitnay was charged with *"direct* supervision, management and control of the ... employees of Pineland Center, subject to the approval of the commissioner." 34 M.R.S.A. § 2632(4)(C) (1978) (emphasis added).[11] Simply put, proper supervision and control of all the employees at the Pineland Center required the exercise of discretion. Moreover, the Pineland Center was created to facilitate "the care and treatment of mentally retarded persons." 34 M.R.S.A. § 2631 (1978).[12] Thus, the discretion required to supervise and manage Pineland employees must be guided by an effort to realize a basic state policy, namely, the proper care and treatment of the mentally retarded patients at Pineland.

The evidence at the trial discloses that both Concannon and Zitnay were acting pursuant to legislative authorization. Commissioner Concannon received reports from Superintendent Zitnay at least once a month. The subject matter of these reports did not come into evidence; indeed, there was no evidence whatsoever showing that Concannon took any action at all related to the events of this case.[13] However, to the extent that Commissioner Concannon is deemed to have constructive knowledge of Szelenyi's supervision by virtue of his

---

**9.** *This section has been repealed and replaced by P.L.1983, ch. 459, § 7 (codified at 34–B M.R.S.A. § 1203(1) (1988)).*

**10.** Commissioner Concannon's full responsibilities at the time were as follows:

[The Commissioner] shall have general supervision, management and control of the research and planning, grounds, buildings and property, officers and employees, and patients and inmates of all of the following state institutions: The hospitals for the mentally ill, Pineland Center, the State Prison, the Maine Correctional Center, the Maine Youth Center, the Military and Naval Children's Home and such other charitable and correctional state institutions as may be created from time to time.

34 M.R.S.A. § 1 (1978).

The nature of the supervisory defendants' functions were the same whether Szelenyi was an employee or an independent contractor.

**11.** This section has been repealed and replaced by P.L.1983, ch. 459, § 7 (codified at 34–B M.R.S.A. § 5402(4)(C) (1988)).

**12.** This section has been repealed and replaced by P.L.1983, ch. 459, § 7 (codified at 34–B M.R.S.A. § 5401 (1988)).

**13.** Because of the plaintiff's lack of evidence showing any connection between any action by Commissioner Concannon and Mrs. Miller's death, we affirm the Superior Court's directed verdict as to Concannon on grounds of insufficient evidence as well as on discretionary immunity grounds.

statutory responsibility of general supervision of Pineland employees, there was no evidence that he acted outside the scope of his authorized discretion. Superintendent Zitnay testified that he had ultimate authority to hire and fire Szelenyi. Indeed, he signed Szelenyi's one-year contract for services as an on-call physician. Moreover, Zitnay was directly involved in Szelenyi's supervision. Zitnay testified that he received a complaint six months prior to Mrs. Miller's death concerning Szelenyi's treatment of a Pineland patient. After discussing the complaint with defendant Scarlata, Zitnay determined that no disciplinary or other action was necessary.[14] Zitnay's decision both to hire Szelenyi and to retain and supervise him were discretionary judgments made pursuant to the legislature's decision to place direct supervision of Pineland employees in the hands of the Pineland Superintendent.

█ Defendant Scarlata also falls under the discretionary immunity provisions of the MTCA. Those who assist or participate in a decision or other action protected by the discretionary immunity provisions are themselves immune to the extent of their assistance or participation. *Darling*, 535 A.2d at 429. Scarlata testified that he was the immediate medical supervisor of the physician staff at Pineland and that he reported directly to Zitnay. In performing this delegated duty, Scarlata was effectively assisting Zitnay, who had "direct supervision, management and control of the ... employees of Pineland Center." 34 M.R.S. A. § 2632(4)(C) (1978).

█ We affirm the trial court's granting of a directed verdict in favor of the defendant Welch on the basis of a complete lack of evidence of any causal connection between Welch and the hiring or supervision of Szelenyi. As the Director of the Bureau of Mental Retardation, Welch was responsible for "carry[ing] out the purposes of the bureau" (34 M.R.S.A. § 2612

(1978)), which was then responsible for "[t]he planning, promotion, coordination and development of a complete and integrated statewide system of mental retardation services." *Id.* § 2611(3).[15] Although Superintendent Zitnay met with Director Welch approximately once a month, their discussions included neither the supervision or review of Pineland physicians, nor any internal Pineland policy relating to employee health. Indeed, there was no evidence that Director Welch was aware of Szelenyi's employment at Pineland prior to Mrs. Miller's death.

### C. *Section 1983 Claims*

#### 1. *Conspiracy Theory*

█ Plaintiffs next contend that the Superior Court erred in denying the plaintiffs an amendment to their complaint to include a claim for conspiracy under section 1983. Plaintiffs sought to prove that the defendants concealed facts of Szelenyi's alleged prior malpractice and facts surrounding Mrs. Miller's death. None of the pleadings contain facts indicating such a conspiracy. Although plaintiffs had filed their complaint 32 months earlier, the conspiracy theory was first brought to the trial court's attention just eight days prior to trial.[16]

█ We review the court's decision to exclude the conspiracy issue for an abuse of discretion under M.R.Civ.P. 15(a). *Hamor v. Maine Coast Memorial Hosp.*, 483 A.2d 718, 720 (Me.1984). To overturn a denial of leave to amend one "must demonstrate a clear and manifest abuse of that discretion and must demonstrate granting such motion is necessary to prevent injustice." *Poulette v. Herbert C. Haynes, Inc.*, 347 A.2d 596, 598 (Me.1975). The imminence of the trial was "by itself sufficient justification for denial of the motion." *Hamor*, 483 A.2d at 720. The plaintiffs' argument that no amendment to their pleadings was necessary because conspir-

---

**14.** We note that affidavits concerning this issue, produced by the State at trial, which the court impounded and kept from the plaintiffs, do not affect the outcome of the issue.

**15.** These sections have been repealed and replaced by P.L.1983, ch. 459, § 7 (codified at 34–B M.R.S.A. §§ 5201(2), 5202(4)(B) (1988)).

**16.** *See supra* section I(B) and n. 5.

acy is not a separate cause of action under section 1983 must also fail. A conspiracy under section 1983 "requires at least minimum factual support" in the pleadings. *Francis–Sobel v. University of Maine,* 597 F.2d 15, 17 (1st Cir.), *cert. denied,* 444 U.S. 949, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979); *Slotnick v. Staviskey,* 560 F.2d 31, 33 (1st Cir.1977), *cert. denied,* 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978). Here, the pleadings contain no such facts. The court was well within its discretion in excluding the conspiracy issue from the case.

### 2. *Emergency Medical Care*

█ We turn next to plaintiffs' section 1983 claims presented to the jury in Phase II.[17] The plaintiffs sought damages under section 1983 on behalf of Therese Miller's estate for her loss of life without due process and for the individual plaintiffs' loss of their liberty interest in consortium and association with the decedent. Both claims flow from the care and treatment ultimately provided by the defendants for Mrs. Miller during her heart attack at the hospital. Because the State had no *constitutional* duty to provide emergency medical care to Mrs. Miller, we affirm the Superior Court's direction of a verdict in favor of the defendants on the plaintiffs' section 1983 claims.

As with all section 1983 claims, we are guided primarily by federal interpretations of that statute. The threshold inquiries are 1) whether the defendants acted under color of state law and 2) whether the plaintiffs were deprived of a right secured by the Constitution or laws of the United States. *See Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420, 428 (1981), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). No one argues on appeal that the supervisory defendants were not acting under col-

or of state law. We assume here, without deciding, that Szelenyi, acting under a one-year contract with the State, was also acting under color of state law. *See West v. Atkins,* —— U.S. ——, ——, 108 S.Ct. 2250, 2258–60, 101 L.Ed.2d 40 (1988), *rev'g* 815 F.2d 993 (4th Cir.1987). As to whether Mrs. Miller had a right to basic medical care, we start our analysis cognizant of the fact that the Supreme Court has not yet found in the due process clause of the fourteenth amendment any general, substantive right to the provision of basic medical services by the State. *See, e.g., Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 2459, 73 L.Ed.2d 28, 38 (1982) ("a State is under no constitutional duty to provide substantive services for those within its border"); *Maher v. Roe,* 432 U.S. 464, 469, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484, 492 (1977) ("The Constitution imposes no obligation on the States to pay ... any of the medical expenses of indigents."); *see also Wideman v. Shallowford Community Hosp. Inc.,* 826 F.2d 1030, 1034 (11th Cir.1987) (no "general right to the provision of medical care and services by the state").

While the free citizen on the street has no federal constitutional right to basic medical or other protective services by the State, those people in the State's custody often do have such a right. If the State "takes a person into custody or otherwise assumes responsibility for that person's welfare," a so-called "special relationship" may be created between the State and the individual whereby the fourteenth amendment imposes a duty on the State "to assume some measure of responsibility for the person's safety and well-being." *Estate of Gilmore v. Buckley,* 787 F.2d 714, 721 (1st Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986). In *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251, 260 (1976),

---

**17.** Title 42 U.S.C. § 1983 reads in pertinent part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected any citizen of the United States or other per-

son within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

the Supreme Court held that deliberate indifference by prison officials to a prisoner's serious medical needs states a cause of action under section 1983. While a prisoner's right arises from the eighth amendment's prohibition against cruel and unusual punishment, the Supreme Court has also implicitly held that the due process clause itself provides a right to basic medical care for individuals who are involuntarily committed in civil institutions. *Youngberg v. Romeo,* 457 U.S. at 324, 102 S.Ct. at 2462, 73 L.Ed.2d at 42 ("[T]he State concedes a duty to provide adequate food, shelter, clothing, and medical care. These are the essentials of the care that the State must provide."). Thus, when an individual is either incarcerated or involuntarily committed in a civil institution, the State must provide certain basic services which the individual can no longer provide for himself. The required services should "comport fully with the purpose of [the individual's] commitment." *Youngberg v. Romeo,* 457 U.S. at 324, 102 S.Ct. at 2462, 73 L.Ed. 2d at 43; *see also City of Revere v. Massachusetts General Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605, 611 (1983) (Due process clause requires "responsible government or governmental agency to provide medical care to persons ... who have been injured while being apprehended by the police.").

As a State employee at the Benda Hospital of the Pineland Center, Mrs. Miller was neither a state prisoner nor was she in the state's custody as an involuntarily committed patient. Thus, she was deprived of no constitutional right to basic medical care as delineated thus far by the Supreme Court. Nevertheless, some federal circuits have alluded to the expansion of the "special relationship" to circumstances in which the individual is not in the State's physical custody. *See, e.g., Ellsworth v. City of Racine,* 774 F.2d 182, 186 (7th Cir.1985) (noting that there "may be situations when a municipal employee and the municipality have, by virtue of the employment relationship, a special relationship for purposes of § 1983," but finding no such relationship on the facts of that case), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986). To expand the State's duty to provide basic services to instances where the individual is outside the State's physical custody, the State must either strip the individual of his ability to procure the basic service or affirmatively place the individual in a "position of danger that [he] would not otherwise have been in." *Estate of Buckley v. Gilmore,* 787 F.2d at 722; *see also Wideman v. Shallowford Community Hosp., Inc.,* 826 F.2d at 1035–36 (state must exercise "coercion, dominion or restraint" over the individual); *Walker v. Rowe,* 791 F.2d 507, 511 (7th Cir.1986) ("the rationale lies in constraints the state imposes on private action"), *cert. denied,* 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986).

Mrs. Miller's employment relationship with the State did not itself prevent her from securing her own basic medical services. Her employment with the State was of her own choosing. The employment relationship was neither coercive nor restraining; it in no way prevented her from choosing her own private physician. Indeed, no court has yet imposed a duty on the State to provide a basic service merely because of an individual's *voluntary* employment with the State. *See Walker v. Rowe,* 791 F.2d at 510–11 ("due process clause does not assure safe working conditions for public employees"); *Ellsworth v. City of Racine,* 774 F.2d at 186 (no duty to protect policeman's wife from hostile police investigation suspect).

Although Szelenyi arguably took "custody" over Mrs. Miller during her emergency, and did affirmatively prevent defibrillation of her, the State did nothing to cause Mrs. Miller's original heart attack. The State did not affirmatively place Mrs. Miller in a situation of danger. Her heart attack was a completely fortuitous event. Far from creating the danger to Mrs. Miller, the State attempted to help her. *See Wideman v. Shallowford Community Hosp., Inc.,* 826 F.2d at 1036 n. 9 (no special relationship creating right to emergency medical service between pregnant plaintiff and government ambulance service that took plaintiff to wrong hospital, since "the condition allegedly causing her injury

occurred *before* she submitted to [ambulance] 'custody' ") (emphasis in original); *Bradberry v. Pinellas County*, 789 F.2d 1513, 1518 (11th Cir.1986) (defendant county, which hired and trained lifeguard, had no constitutional duty to rescue decedent who swam too far off shore because county did not create decedent's peril); *see also DeShaney v. Winnebago County Dep't of Social Servs.*, 812 F.2d 298, 303 (7th Cir. 1987) ("The botched rescue must be distinguished from the case where the State places the victim in a situation of high risk....”), *cert. granted,* — U.S. —, 108 S.Ct. 1218, 99 L.Ed.2d 419 (1988).

Courts have also recognized that the duty under state law to perform an attempted rescue in a non-negligent way does not inhere in the due process clause. "The Constitution, as opposed to local tort law, does not prohibit grossly negligent rescue attempts nor even the grossly negligent training of state officers." *Bradberry v. Pinellas County*, 789 F.2d at 1517; *see also Wideman v. Shallowford Community Hosp., Inc.*, 826 F.2d at 1037; *Jackson v. Byrne*, 738 F.2d 1443, 1447 (7th Cir.1984). Thus, in the instant case, the plaintiffs' proof failed as a matter of law to show that the State had a duty to provide Mrs. Miller with emergency medical care. Neither Mrs. Miller's employment relationship with the State nor the grossly negligent treatment provided her by Szelenyi at the scene of her collapse created a duty under the fourteenth amendment to provide competent emergency medical care. Accordingly, the trial court properly granted the defendants' motion for a directed verdict.[18]

The entry is:

Judgment affirmed.

All concurring.

---

**18.** Having denied the plaintiffs' appeal on all their substantive claims, we need not address the plaintiffs' claim for punitive damages.