**Deborah H. FITZGERALD**

v.

**Frederic H. GAMESTER et al.**

Supreme Judicial Court of Maine.

Argued March 3, 1995.

Decided May 24, 1995.

Jeffrey W. Jones (orally), Jones & Warren, Scarborough, for plaintiff.

William S. Kany and Karen B. Lovell (orally), Smith, Elliott, Smith & Garmey, P.A., Saco, for defendants.

Before ROBERTS, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

DANA, Justice.

Ethel and Charles Ziemba and their daughter and son-in-law, Carol and Frederic Gamester, (the sellers) appeal from the decision of the Superior Court (Penobscot County, *Marsano, J.*) granting a judgment and a post-judgment order of attachment to the buyer of a parcel of real property, Deborah Fitzgerald. The sellers argue that the court erred in admitting parol evidence to vary the terms of the purchase and sale contract, awarding punitive damages, and ordering the ex parte post-judgment attachment against all the sellers jointly and severally. The sellers also argue that the evidence introduced at trial was insufficient as a matter of law to establish liability for fraud. We affirm the judgment and the order of attachment.

The evidence at the trial can be summarized as follows. The sellers purchased the Bugbee Farm in Dexter, Maine in 1986. Charles was a land developer and Carol was a licensed real estate agent in New Hampshire. They obtained approval for a nine-lot lakefront subdivision on the easterly portion of the property and also listed the farm portion of the property for sale. In early 1987 the Ziembas conveyed their interest in the farm to the Gamesters and the Gamesters, in turn, conveyed their interest in the subdivision to the Ziembas. The agency listing was not changed. Neither the Ziembas nor the Gamesters used an attorney to assist in these matters.

A real estate agent directed Deborah Fitzgerald to the property where she met the Ziembas. Charles showed Deborah the house, barn, and some of the property. He stated that the property contained approximately 90 acres of land and was offered at a firm price of $99,000. Although Charles informed Deborah that his daughter, Carol, would handle the details of the transaction, he never stated that he was not the owner of the property.[1]

On Deborah's next visit to the property, Charles walked with her all the way down Shore Road and back up Bugbee Road. Charles told her that she would be receiving one-half of the waterfront Lot 14. He also

1. The court found that Charles acted as both a principal and as an agent for Carol and Frederic. In their brief, the sellers state unpersuasively that Charles "was a means of providing access to the property and nothing more." At the trial Charles testified that "no matter whose name title ownership was in the deed, [they] were gonna split the profits and losses fifty-fifty."

told her that he was moving a portion of Shore Road and that Deborah would own everything to the north side of it. The purchase and sale agreement drafted by Carol and mailed to Deborah described the property as "approximately 90 acres of land at the end of Bugbee Road." The agreement contained four addenda. Addendum A contained the following language:

> This tax map is to be used as a reference and becomes part of this agreement. Parcels A, B, C, & D are excluded from the acreage under this agreement. Parcels "B" & "C" are only estimates as they are in the process of being surveyed. Parcels "A" & "D" have previously been surveyed and the plot plans are attached. (Addendums B & C).

A pencil sketch roughly depicted parcel B and showed the Shore Road prior to its relocation. At the time of the sketch, neither the location of the new Shore Road nor parcel B had been surveyed. Deborah was concerned about apparent discrepancies between what Charles had told her and what was depicted in the addenda. She telephoned Charles and received assurances from him. After those assurances, Deborah signed the agreement which contained a boilerplate integration clause.[2] Neither an attorney nor a surveyor assisted either the buyer or the sellers with the purchase and sale agreement.

The closing took place at the farm in November 1987. The Gamesters were not present. Deborah delivered a check for $87,000[3] and received a deed and a transfer tax form prepared by Carol. The tax form stated that Deborah was receiving approximately 90 acres of land. At the end of the closing, Ethel Ziemba told Deborah not to drink the water. Until that moment the sellers had failed to tell Deborah that the farm's well had long been abandoned due to contamination, and that they had been using a neigh-

bor's water source. Charles had hooked up the abandoned well five or six days prior to the closing. Lab analysis revealed that the water was unfit for human consumption because of high nitrate levels. Carol subsequently pressured Deborah to accept certain conditions and to release the Gamesters from any liability as a result of the malfunctioning well. They did agree to install a new well, but failed to perform this work satisfactorily. For example, sewerage was allowed to flow into the trench containing the water pipe. For eight months Deborah and her family were unable to use the well water for drinking or cooking.

Deborah contacted a lawyer regarding the problem with the well water. A survey prepared at her lawyer's suggestion revealed that her deed conveyed only 7.5 acres and did not even convey the farmhouse. When Deborah contacted Carol to inform her of this problem, Carol called Deborah a "liar" and told her she did not want to be bothered. Although Carol subsequently recorded a corrective deed, neither she nor the other sellers ever told Deborah they had done so. Carol testified that she intentionally excluded a triangular parcel in her corrective deed, although it was part of the original agreement, in order to have some leverage in her future negotiations with Deborah.

Deborah's complaint included six counts: intentional and/or negligent misrepresentation, fraud, unjust enrichment, violation of Maine's unfair trade practices statute, breach of contract, and breach of warranty of title. The sellers counterclaimed for title relief. After a six-day, jury-waived trial, at which 24 witnesses testified, the court found Charles and Carol liable for fraud. The court awarded punitive damages of $15,000 against Charles, $25,000 against Carol, and granted $3,500 in compensatory damages against each of the sellers jointly and severally. Additionally, the court ordered specific perfor-

---

**2.** The integration clause provided as follows:
PRIOR STATEMENTS: All representations, statements, and agreements heretofore made between the parties are merged in this agreement, which alone fully and completely expresses their respective obligations, and this agreement is entered into by each party after opportunity for investigation, neither party re-

lying on any statements or representations not embodied in this agreement, made by the other or in his behalf.

**3.** The purchase price was $99,000. Deborah had paid a $2,000 deposit on signing the purchase and sale agreement. She also gave a $10,000 mortgage to the Ziembas.

mance with regard to part of the property.[4] Finally, the court ordered a post-judgment ex parte attachment against all the sellers jointly and severally in the amount of $55,-000. The sellers did not file a motion for findings of fact and conclusions of law. They did file this appeal.

## I.

■ "The issue of whether contract language is ambiguous is a question of law for the Court." *Portland Valve, Inc. v. Rockwood Sys. Corp.,* 460 A.2d 1383, 1387 (Me. 1983). Contract language is ambiguous when it is reasonably susceptible to different interpretations. *People's Sav. Bank v. Recoll Management, Inc.,* 814 F.Supp. 159 (D.Me. 1993). "Once an ambiguity is found then extrinsic evidence may be admitted and considered to show the intention of the parties." *Portland Valve,* 460 A.2d at 1387.

■ We agree with the court that the purchase and sale agreement was ambiguous. The description of the land in the contract is "approximately 90 acres of land at the end of Bugbee Road." Addendum A contains pencil sketches that are described in the instrument itself as "only estimates." The court committed no error when it admitted parol evidence to explain ambiguities in the purchase and sale agreement. *Cf. Portland Valve,* 460 A.2d at 1387 (prohibiting the admission of extrinsic evidence because contract was not ambiguous). *See Palmer v. Nissen,* 256 F.Supp. 497, 503 (D.Me.1966).

## II.

■ A person is liable for fraud if the person

(1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person justifiably relies on the representa-

tion as true and acts upon it to the damage of the plaintiff.

*Grover v. Minette–Mills, Inc.,* 638 A.2d 712, 716 (Me.1994). When a plaintiff alleges a failure to disclose rising to the level of a misrepresentation, the plaintiff must prove either (1) active concealment of the truth, or (2) a specific relationship imposing on the defendant an affirmative duty to disclose. *H.E.P. Dev. Group, Inc. v. Nelson,* 606 A.2d 774, 775 (Me.1992). *See* Horton & McGehee, *Maine Civil Remedies* § 21.6 at 21–4 (1994).

■ Here, based on the evidence submitted to it, the court reasonably could have found the following. The sellers (1) did not disclose; (2) the material fact that the well had been abandoned due to contamination; (3) with knowledge of the non-disclosure; (4) for the purpose of inducing Deborah to purchase the farm; and Deborah (5) justifiably relied on the omission; and she (6) consequently was forced to purchase water for her family from November 1987 to June 1988 and incurred other expenses in connection with the well. Carol also (1) made the false representation; (2) of the material fact that she was going to convey approximately 90 acres of land to Deborah; (3) with the knowledge of its falsity or in reckless disregard of whether it was true or false; (4) for the purpose of inducing Deborah to purchase the farm; and Deborah (5) justifiably relied on Carol's representation; and (6) incurred extraordinary surveyor expenses to rectify the documents drafted by Carol. The evidence introduced at trial was sufficient to establish the sellers' liability for fraud. *See Grover,* 638 A.2d at 716.

## III.

■ "A plaintiff seeking punitive damages must show by clear and convincing evidence that the defendants' conduct was motivated by actual ill will, or that the conduct was so outrageous that malice is implied." *Grover,* 638 A.2d at 717–18. Where factual findings must be made on the basis of

4. The court ordered the defendants to convey "approximately one-half of lot number 14 as shown upon Plaintiffs exhibit no. 3" and other land "north of the Shore Road." The court further ordered the defendants to convey a right-

of-way to these lots. The court denied Deborah all other claims for relief and it denied all claims for relief sought by the sellers in their counterclaim.

clear and convincing evidence, the standard of review is "whether the factfinder could reasonably have been persuaded that the required factual finding was or was not proved to be *highly probable.*" *In re Debra B.*, 495 A.2d 781, 783 (Me.1985) (quoting *Taylor v. Commissioner of Mental Health*, 481 A.2d 139, 153 (Me.1984)). In the absence of a motion to the trial court for specific findings of fact and conclusions of law, we assume that the trial court found all of the facts necessary to support its decision. *Bayley v. Bayley*, 602 A.2d 1152, 1154 (Me.1992).

 The punitive damages awarded to Deborah were based on the fraud committed by Charles and Carol. There is competent evidence in the record to support the trial court's finding to a high degree of probability that Charles and Carol were motivated by actual ill will when they sold the property to Deborah without telling her that the well had been abandoned due to contamination and conveyed substantially less than the agreed on 90 acres, or that such conduct was so outrageous that malice can be implied. *See Grover*, 638 A.2d at 717–18; *DiPietro v. Boynton*, 628 A.2d 1019, 1024 (Me.1993).

### IV.

 We review decisions to grant or deny an attachment under the clearly erroneous and abuse of discretion standards. *Calvert v. Corthell*, 599 A.2d 69, 71 (Me.1991). In its order dated February 9, 1994, the court stated:

> Although there is no joint judgment, the title to the real estate has never been made clear. The Defendants have conveyed real estate back and forth so that record title may be misleading. The intent of the Court's Order of attachment was to hold all of the real estate, which in the Court's view is owned equitably by all four Defendants, to satisfy all of the judgment.

The sellers rely on *Bowman v. Dussault*, 425 A.2d 1325, 1328 (Me.1981), for the proposition that "the procedures and requirements governing the granting of attachments must be strictly construed and applied." Their reliance is inapposite. In *Bowman* this Court stated that "[b]ecause *prejudgment* at-tachment can wor serious hardship on a defendant *before* the merits of the plaintiff's case are fully determined, the attachment procedures ... must be strictly adhered to." *Bowman*, 425 A.2d at 1328 (emphasis added). In the circumstances of this case, where the court has already found that the sellers committed fraud and where the record title of the attachable real estate may be misleading, the joint attachment order was within the discretion of the court. *See Calvert*, 599 A.2d at 71.

The entry is:

Judgment affirmed.

All concurring.