**Joseph H. SUTTON, Plaintiff**

v.

**Dr. Raymond E. CULVER and Rhonda M. Rugan, Defendants**

**No. CIV. 00–206–P–C.**

United States District Court,
D. Maine.

May 21, 2002.

Gregory Paul Hansel, Esq., Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Stephen C. Whiting, Whiting Law Firm, P.A., Portland, ME, Edward P. Watt, Esq., Watt & Associates, Austin, TX, for Joseph H. Sutton.

David J. Van Dyke, Berman & Simmons, P.A., Lewiston, ME, for Raymond E Culver, Rhonda M Rugan.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

This case grows out of an attempted real estate sale gone bad. Plaintiff Joseph Sutton ("Sutton") offered to purchase from Dr. Raymond Culver ("Culver") and Rhonda Rugan ("Rugan") (collectively "Defendants") a property in Southport Maine (the "Southport property") owned by them in joint tenancy. Plaintiff maintains that Defendants breached their agreement in April of 2001 to sell him the Southport property (Count I), while Defendants dispute that a contract was ever formed. In the alternative, Defendants contend that, even if there was an oral agreement, the statute of frauds bars enforcement of any alleged agreement. Plaintiff has also filed claims for negligent misrepresentation (Count V) and promissory estoppel (Count VIII). Plaintiff seeks specific enforcement of the alleged contract (Count III) and money damages. Defendants have filed a counterclaim for slander of title, seeking monetary damages from Plaintiff. Pending before the Court are Plaintiff's motion for leave to amend the pleadings in order to include counts for fraud which were dismissed before trial (Docket No. 43), and Plaintiff's motion to reopen the evidence in connection with the fraud counts (Docket No. 44). *See also* Order Affirming The Recommended Decision Of The Magistrate Judge (Docket No. 16). After a two-day bench trial, the Court now enters its findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT

1. Plaintiff Joseph Sutton and his wife, Betty Sutton, are residents of Raymondville, Texas, who spend time during the summer at a home Sutton owns in Boothbay, Maine. Tr. at 19–20, 93. Sutton also owns a business in Maine, Uncle Henry's, which publishes "The Buy Sell Swap Guide." Tr. at 19–20. The business is run by his sons. *Id.* In 1999, Mr. Sutton began looking for oceanfront property to purchase. Tr. at 20–21.

2. Defendant Raymond Culver, M.D., ("Culver") is a practicing gastroenterologist in Waterville, Maine. Tr. at 103, 139.

3. Culver inherited oceanfront property, referred to as the Southport property, from an elderly patient and friend, Lenore Hilton, in 1997. Tr. at 103–04, 253, Ex. 13–16.

4. Culver and Defendant Rhonda Rugan were romantically involved, and in or about 1997, Culver deeded an undivided half interest in the Southport property to Rugan, and the two hold the property as joint tenants. Tr. at 103, 106.

5. Both Culver's and Rugan's names are on a note for a reverse mortgage on the Southport property. Tr. at 171, 300.

6. Sutton learned of the Southport property from a local restaurant owner, who indicated she thought the owners might be willing to sell it, and she drove the Suttons by the property owned by Defendants, which was not listed for sale at that time. Tr. at 21.

7. Later, Sutton called Culver to inquire about purchasing the property, and Culver indicated an interest in selling it.

They initially discussed a price between $850,000 and $950,000. Tr. at 22. Sutton offered to buy the Southport property for $900,000, and Culver indicated that he would need to get Rugan's approval to carry out the agreement. Tr. at 112. Sutton and Culver then met in person at the property, and at that meeting Sutton testified: "[Culver] made it very clear to me that the property will be sold with him, and the other party, both agreeing to sell the property." Tr. at 23. On his first visit to the house, Sutton met Rugan briefly and they exchanged greetings, but she was not present during and did not participate in, the discussions about selling the property. Tr. at 167–68. Rugan testified that she overheard Culver tell Sutton during their first meeting that Rugan was going to have to be convinced to sell, and that Sutton need not discuss it with her. Tr. at 168. Rugan testified that she heard Culver say, "if she thinks this house is hers, it's fraudulent and I will have her throat." *Id.* Culver requested that Sutton deal only with him and not with Rugan. Tr. at 51–52. But Culver never told Sutton that he had the authority to bind Rugan, and Culver never told Rugan, nor was she aware, that he ever represented to Sutton that he had her authority to sell the property. Tr. at 155, 192.

8. Sutton and Culver had multiple conversations regarding negotiating the potential sale during the fall of 1999, but Sutton knew that Culver never had the authority to bind Rugan to a sale. Sutton does not dispute Culver's testimony that, "Joe and I had several conversations about this problem with Rhonda not selling the house and Joe asked me my opinion about what we should do to get Rhonda to sell this house." Tr. at 115. Sutton knew that Rugan had an ownership interest in the subject property, and he knew that Rugan was reluctant to sell. Despite Rugan's reluctance, Culver discouraged Sutton from contacting Rugan directly because he believed he could "convince" Rugan to sell the property to Sutton. Tr. at 27, 168.

9. During the fall of 1999, Joe Sutton visited the property again with Betty Sutton. Tr. at 94. In late fall, Betty Sutton and her daughter visited the property. Tr. at 95. Rugan was not present for either of these visits. Tr. at 94–95.

10. Around December of 1999, Culver indicated that the deal was not going forward because Rugan would not agree to sell the property. Tr. at 25–26. At that time, Sutton told Culver not to contact him again regarding the sale until Culver and Rugan were "both ready to sell." Tr. at 26, 28.

11. Approximately two and a half months passed with no communication between Culver and Sutton, and in late February or early March 2000, Culver called Sutton. Tr. at 26–27. Culver rejuvenated talks with Sutton in the spring because Culver and Rugan had decided that they were not going to live together at the property because it was too far from each of their places of work. Tr. at 150. By the spring of 2000 Rugan had decided that she was willing to sell the property, but not that she wanted to sell it to Sutton. Tr. at 155, 201. Further, Rugan told Culver, "She was not going to deal with the issue until she dealt with Mr. Sutton on her own basis, on her own stead." Tr. at 147. Culver explained that when he reinitiated contact with Sutton in March, what "he wanted to have happen was for Joe to deal with Rhonda on a one on one basis." Tr. at 150. Culver told Sutton that he and Rugan had mended their problems, and he said, "We will sell you the property for $950,000" in cash and up front. Tr. at 28–29, 33, 118; Joint Stipulation No. 4. Sutton countered with $475,000 up front and $475,000 one year later. Tr. at 30–32.

Culver responded that he would have to get Rugan's approval, and he suggested that Sutton call Rugan directly. Tr. at 30, 117. Discussions continued between Culver and Sutton, and Culver indicated that he and Rugan wanted the second payment of $475,000 by January 15, 2001. Tr. at 31. Sutton testified that Culver conveyed to him the notion that, "if I agreed to pay it off by January the 15th of the following year that he didn't understand why we wouldn't have a deal. He didn't say it but it was as if c'mon man, and I accepted it." Tr. at 36. Sutton further testified, "When we left the conversation [Culver] did not accept my offer because he didn't have the authority to do so. It was an implied, you know, I need to talk to Rhonda [Rugan]." Tr. at 36. Sutton understood that he should hire an attorney and other professionals necessary to complete the transaction. Tr. at 33–34; Joint Stipulation No. 6. At that time, Culver gave Sutton the name of his accountant, Bill Mangum, as his contact. Tr. at 39. ·

12. Culver admitted that when he had said "we will sell you the property" that he had "falsely represent[ed]" Rugan's willingness to sell, and that his true meaning was, "I hope she will sign." Tr. at 113–14.

13. Sutton's attorney, Hylie West began drawing up documents, went over drafts with Sutton, and then faxed a copy to Bill Mangum. Tr. at 276–78. West spoke with Mangum on March 21, 2000, and in that conversation Mangum indicated that there were some typographical changes that needed to be made in the contract. Tr. at 279. Mangum also gave West the name of Culver's attorney, Warren Winslow. Tr. at 278.

14. West sent the contract to Sutton on March 21, 2000. Tr. at 37–38, Ex. 2.

15. Culver contacted attorney Winslow on March 22, 2000. Ex. 41.

16. West sent the contract to Mangum on March 22, 2000. Ex. 4. Mangum faxed a copy of the contract to Winslow on March 27, 2000. Tr. at 214, Ex. 7. Winslow then spoke to West and indicated that West should amend the contract to include an earnest money deposit for $1,000. Tr. at 214–15, 279.

17. On March 29, 2000, West sent Winslow a revised contract that included language referring to the earnest money deposit. Tr. at 214; Ex. 8.

18. On March 30, 2000, Winslow met with Rugan and Culver and discussed the draft contract. Tr. at 215–16, Ex. 42. Winslow testified: "[I]t was my understanding that Dr. Culver had talked with Mr. Sutton a number of times and they had pretty much agreed on the terms so I might not have been quite so specific" in going over the contract language at this meeting. Tr. at 250. Winslow testified that at that meeting, Rugan had some tax questions which "suggested a disparate interest from that of Dr. Culver." Tr. at 255–57. "[O]nce she started going into the tax aspects as to how it might affect her personally as opposed to Dr. Culver, I recommended [she] get separate counsel. I was not in a position to advise her in that indication [sic] . . . [o]r anything at that point." Tr. 217–18.

19. Winslow testified that he had never represented Ms. Rugan in any capacity.[1] Tr. at 252. Winslow never told anyone involved in this transaction that he represented Rugan or that he was authorized to act on Rugan's behalf. Tr. at 254–55. Winslow knew that Rugan was a joint

---

1. Winslow further explained that any documentation from Plaintiff's attorneys, *e.g.*, the letter from Gulino dated June 13, 2000, indi-cating that Winslow represented both Culver and Rugan, was a mischaracterization of his role. Tr. at 260.

owner of the property at issue, and Rugan never told Winslow, nor did he believe, that Culver was authorized to act for her. Tr. at 253–55. Although Rugan was amenable to selling the property, she never told Culver or anyone else that she was willing to sell to Sutton. Even after meeting with Winslow, Rugan had not agreed to sell to Sutton. Tr. at 191.

20. At some point, Winslow and West agreed that the documentation was satisfactory. Tr. at 212. On March 31, 2000, West sent a letter to Sutton stating that Winslow had indicated that the contract was agreeable. Ex. 9.

21. West called Sutton to tell him that Winslow had requested earnest money in the amount of $1,000. Tr. at 40; Ex. 10. On April 7, 2000, Sutton's son Jason made out a check to Pierce Atwood, Winslow's firm, for $1,000. Ex. 12. The check was drawn on the Uncle Henry's account, and contained "Dr. Ray Culver" in the memo line. *Id.* Winslow received the earnest money check and, on April 11, 2000, he deposited the check into Pierce Atwood's escrow account. Tr. at 225–26. Winslow testified that he did not form any understanding about the state of the parties' agreement on the basis of receiving the check. Tr. at 225–26.

22. The initial draft contract did not contain any mention of personal property, and Sutton told West that he and Culver had discussed including some personal property in the sale. Tr. at 38–39. Sutton wanted to amend the contract, but he did not want it to be a "deal-breaker." Tr. at 41. On April 7, West faxed a request to Winslow to amend the contract by including items of personal property. Tr. at 226–27; Ex. 10. Pursuant to West's request, Winslow had someone in his office type in the personal property contents and, after talking to Culver, he placed the contract in his front office for Culver and

Rugan to come in, review, and sign *if they agreed.* Tr. at 219, 228–29; Ex. 11.

23. By April 7, Sutton had signed the contract and returned it to West. Tr. at 43–44; Ex. 10, 11.

24. Winslow then represented to West that he believed Culver and Rugan were going to sign the contract. Tr. at 219.

25. At some point, West discovered a discrepancy between the survey of record identifying the property and the deed. Tr. at 280. West contacted Winslow, who had also probated the estate of Lenore Hilton and deeded the Southport property to Culver. Tr. at 210–11. Because it was necessary to reopen Lenore Hilton's estate to effectuate the change, Winslow contacted Mangum, who had been Hilton's personal representative. Tr. at 210, 280. Winslow and Mangum completed the necessary documentation to reopen the estate and correct the deed through correspondence dated April 7, 12, 17, and 18, 2000. Ex. 13–16.

26. During this time, Sutton placed calls to Culver, West, and Winslow to inquire about the status of the deal. Tr. at 46–49. West advised Sutton that Culver had said that the parties were going to sign the contract. Tr. at 46–47. At some point, Culver's administrative assistant called Sutton to report that Culver was out of town taking care of a sick relative in Michigan or Illinois. Tr. at 47–48. Sutton testified that Culver called Sutton directly and apologized for the delay in signing the contract. Tr. at 48.

27. Around April 12, 2000, Mangum called Rugan "out of the blue" and told her that he had a contract that he was waiting to have her sign. Tr. at 194–95. During the conversation with Mangum, Rugan expressed surprise that the deal was settled and ready for her signature. Tr. at 195. Mangum then faxed a copy of the contract to Rugan at her office, and Rugan called

Culver and again told him that she was not going to sign it. Tr. at 195–96. On or about April 14, 2000, Culver called Sutton and instructed him to call Rugan directly; he said he thought Sutton "ought to call Rhonda and push her." Tr. at 50, 130. Culver also asked Rugan to call Sutton. Tr. at 195–97.

## Rugan's Telephone Call With The Suttons

28. Sutton called Rugan and left her a message. Tr. at 51. Rugan called back and spoke to both Joe and Betty Sutton via speakerphone on or about April 15 or 16, 2000. Tr. at 51, 131. During this telephone call, Rugan raised her concerns about the sale, including: (1) that the reverse mortgage be paid off with the proceeds of the sale, (2) she asked for permission to walk the dog that had formerly belonged to Lenore Hilton on the property, (3) she wanted to keep some personal property that was in the shed, including a pair of rose snips, and (4) she had lingering questions about the tax consequences of the sale. Tr. at 53–55, 171. Sutton testified that Rugan "was concerned that Ray [Culver] was going to stick her . . . [and] that Ray wasn't going to use some of that money to pay off the note that apparently she and Ray used this property as collateral on." Tr. at 53. Sutton addressed Rugan's issues about walking the dog and the personal property in the shed. In addition, Sutton attempted to assure Rugan that the proceeds of the sale would

satisfy the reverse mortgage. Tr. at 53–54.

29. Nevertheless, Sutton believed at the end of that conversation that he had a deal with Rugan despite the fact that Rugan was going to seek the advice of her attorney about some difference she had with Culver. They did not discuss Rugan's personal tax consequences as a result of the sale. Tr. at 55–56, 171. Betty Sutton testified that, at the end of the conversation, Rugan was "just was going to confirm what Joe [Sutton] had said with her attorney and we were going to do it." Tr. at 53. Mrs. Sutton testified that when the phone conversation with Rugan ended, Mrs. Sutton "understood that [Rugan] still had something to do, she would check with her attorney . . . and that . . . she had a separate attorney from Dr. Culver." [2] Tr. at 101.

30. Rugan testified that, although she agreed generally with the most recent terms of the sale, she told the Suttons, "I have the contract, it looks good, but that [I] needed to get legal advice before [I] signed it. . . . If the attorney says go, I'll do it." Tr. at 171.

## Rugan's Meeting With Attorney Eames

31. As a result of the lingering questions Rugan had about the tax implications of the sale and after Winslow had suggested to her that she get her own counsel, Rugan met with attorney Donald Eames on April 18, 2000.[3] Tr. at 183. At their

---

**2.** Mrs. Sutton further testified: "Well, I guess that because they weren't married, [Rugan] just kind of wanted to check with her attorney against his attorney to make sure things were kosher." Tr. at 99. The Court finds that Mrs. Sutton's understanding of the status of the agreement after the phone conversation was driven by her relationship with Sutton: "I think the problem here is Joe is our boss and he signs and buys and sells, and I don't think we ever imagined somebody in the background would hold up the procedures. We

wheel and deal a lot and I don't know about that." Tr. at 96.

**3.** Rugan explained that she sought the advice of attorney Eames because although Winslow "told me . . . 'If you agree to this I can handle all of it,' [he also said that i]f I had other questions I could do whatever I wanted. I had more questions about the IRS. I didn't like the reply that Mr. Winslow had given me on the IRS." Tr. at 184.

meeting, attorney Eames and Rugan discussed real estate sales generally and, in particular, Maine transfer tax and capital gains. Tr. at 266. Eames and Rugan did not discuss the specific contract for sale of the Southport property to Sutton at this meeting. Tr. at 266.

32. In early April 2000, Culver met William and Margaret Helming walking across Defendants' property on the beach. Tr. at 298; Ex. 45. They had just purchased the adjacent property, and they expressed interest in buying Defendants' property as well. Tr. at 131–33. On or about April 17 or 18, 2000, Culver, Rugan, and Bill and Peg Helming had a conversation about the Helmings purchasing the Southport property.

33. Helming, a former client of West, contacted West on or about April 18 or 19, 2000, about buying Defendants' property. Tr. at 282. West told Helming that he could not be involved because he already represented a purchaser for that property. *Id.*

34. On April 24, 2000, Winslow learned of the potential new deal with Helming and returned Sutton's earnest money in the form of a new check drawn on Pierce Atwood's trust account for $1,000. Tr. at 134, 234, 239; Ex. 17.

35. On or about April 24, 2000, Sutton called West and told him the sellers were backing out of the deal, and West then revealed to Sutton that he had been contacted by Helming about the property. Tr. at 282.

36. On April 27, West returned the check to Winslow, and as of the date of trial, the check had not been cashed. Tr. at 238–39; Ex. 18.

37. Between April 24, 2000 and May 8, 2000, Sutton attempted unsuccessfully to contact Culver by telephone. Tr. at 62. On or about May 3, 2000, Sutton filed a Notice of Interest in Real Property, referred to by Plaintiff as a "lis pendens." Stipulation No. 9; Ex. 23. On July 11, 2000, Plaintiffs filed this lawsuit. Complaint (Docket No. 1).

38. On or about May 8, 2000, Sutton and Culver had two telephone conversations wherein Culver acknowledged that a "deal" existed between Sutton and Culver, but Culver contended that Rugan had never agreed to the $950,000 contract; Sutton denied that Rugan had never accepted the deal. Stipulation No. 8. Sutton testified that after this conversation he understood, "apparently..., I wasn't going to get a sale." Tr. at 64.

39. After settlement negotiations between Defendants and Plaintiff had broken down, on July 24, 2000, Defendants signed a contract to sell the Southport property to the Helmings for $995,000. Tr. at 304–05. The Southport property has not been transferred due to the notice placing a lien on the property and this pending litigation, creating a cloud on the title. Tr. at 299.

## II. CONCLUSIONS OF LAW

### Oral Agreement

█ Plaintiff claims that Defendants breached an oral agreement to sell him the Southport property. In order for there to be an agreement, the parties must have manifested their mutual assent to all of its material terms. *See Paris Utility*, 665 F.Supp. at 952. Defendant Culver has admitted to making several agreements with Plaintiff to sell him the Southport property throughout the fall of 1999 and in the spring of 2000. Plaintiff maintains that he also had an agreement with Defendant Rugan, a joint owner of the Southport property, based on a telephone conversation with her on or about April 16, 2000. Both Defendants dispute that Rugan ever agreed to sell the property to Sutton.

Plaintiff puts forth several theories for establishing an agreement with Rugan, including that she expressly agreed and, alternatively, that statements made by Culver and Winslow, Culver's attorney, bound Rugan to the deal. Plaintiff argues that Culver had actual authority to bind Rugan and, alternatively, that Culver had apparent authority to bind her. Plaintiff also argues that Winslow had actual and/or apparent authority to bind Rugan in the contemplated sale of the Southport property.

### Express Agreement

■ Sutton knew that Culver and Rugan jointly owned the property and that the consent of both parties was required to form an agreement. There is no dispute that on several occasions Culver agreed to sell the property to Plaintiff. Sutton alleges that Culver had Rugan's consent to bind her to the sale he negotiated. As joint tenants, Culver and Rugan each held an undivided one-half interest in the entire Southport property. *See, e.g., Hardigan v. Kimball,* 553 A.2d 1265, 1266 (Me.1989). Unless Rugan expressly told Culver that he could bind her to an agreement, one joint tenant can convey to another only the interest that he or she holds. *See United States v. Craft,* —— U.S. ——, ——, 122 S.Ct. 1414, 1421, 152 L.Ed.2d 437 (2002). The Court finds that Rugan never expressly gave Culver the authority to bind her in a sale of the property.

■ Plaintiff also argues that Rugan made an oral agreement to sell him her interest in the property, but the evidence does not support this contention. Sutton testified as to his state of mind after the April 16, 2000, phone call with Rugan, stating that he thought they "would have a deal" after Rugan met with her attorney and allayed her concerns that Culver "was going to stick her." Tr. at 55–56. Given the Suttons' testimony that Rugan was going to consult an attorney regarding her tax liability as a result of the sale, the existence of an agreement with Rugan was nothing more than hopeful thinking on the part of the Suttons. The Court concludes that Plaintiff has failed to establish that Rugan personally made any agreement to sell him the Southport property.

### Apparent Authority

■ Plaintiff also argues that Culver had apparent authority to bind Rugan to a sale. The "essence of apparent authority" is when party A's conduct is such that it would lead a third party reasonably to believe that party B was A's agent. *Rulon–Miller v. Carhart,* 544 A.2d 340, 342 (Me.1988). That is, Plaintiff must demonstrate evidence of specific instances of Rugan's conduct that reasonably could have led Sutton to believe that Culver was her agent. The issue, therefore, is Rugan's conduct, not Culver's conduct.[4] Culver made several assurances that he and Rugan would sign the contract already signed by Plaintiff, at least one of which was communicated through his attorney, Winslow, to Plaintiff's attorney, West, and others were communicated to Plaintiff directly. Sutton was aware that Culver was trying to convince Rugan to sell. Nothing

---

**4.** Plaintiff argues that *Chapman v. Bomann,* 381 A.2d 1123, 1128 (Me.1978), should control this case. In *Chapman,* the Maine Law Court found that Defendant's designation of his wife and himself as "seller," despite their being joint tenants, was a holding out by him that he and his wife were acting together to sell the property, and that she was his agent. Plaintiff then properly relied on the promise made by Defendant's wife, as her husband's agent, to the purchasers that she and her husband would sign the contract. In those circumstances, the wife's separate ancillary promise was attributable to her husband and promissory estoppel was invoked to enforce the purchase and sale agreement.

Rugan ever did in Sutton's presence would lead him to believe that Culver had apparent authority to bind her. In fact, after the reinitiation of contract discussions in the Spring of 2000, Culver informed Sutton that he thought it was time for Sutton to deal directly with Rugan. Rugan had told Culver not to represent her at the table in selling the property, and Culver told Sutton from their first dealings that Rugan's approval was necessary and that he thought he would be better able to convince her to sell that Sutton would. Tr. at 154. Culver had no apparent authority to bind Rugan because Rugan continually expressed her reservations about selling the property to Sutton.

Sutton did not act like Culver had apparent authority here. Although early in the Fall, negotiations Culver's statements may have mislead Sutton into thinking that Culver was in the driver's seat, the subsequent events provide no basis for a belief that Culver ever had had any authority to act for Rugan. In fact, the import of the events was clearly to the contrary. When Sutton first met Rugan, he learned of her reluctance to sell from Culver, who discouraged him from contacting her directly. Sutton apparently obliged and permitted Culver to "deal with" Rugan, despite understanding that her express agreement would be independently necessary in order to purchase the property. Sutton knew that Rugan's separate agreement and her signature were required before he could complete the deal that he had made with Culver, and so when Culver informed him that she might be warming up to the deal, Sutton called Rugan directly and attempted to satisfy her independent concerns. When questioned by the Court whether Rugan had done anything to lead Sutton to believe that Culver had authority from her to commit her to a deal, Sutton testified that it was Culver's "word only. I had no contact

from her...." Tr. at 75. The Court finds that Culver had no apparent authority to bind Rugan to any deal with Sutton and, therefore, no oral agreement was reached.

## Statute of Frauds

■ Even if the Court were to find an oral agreement here, the promise is not enforceable. Defendants argue that the Maine Statute of Frauds bars enforcement of a contract for an interest in land, "unless the promise, contract, or agreement on which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith, or by some person thereunto lawfully authorized...." 33 M.R.S.A. § 51(5) (West 2001). A "contract within the Statute of Frauds is enforceable if it is evidenced by any writing, signed by or on behalf of the party to be charged, which ... is sufficient to indicate that a contract with respect thereto has been made between the parties...." *Wilson v. DelPapa*, 634 A.2d 1252, 1254 (Me.1993) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 131 (1981)). There is no writing signed by the Defendants, here the parties to be charged in this case.

■ Plaintiff argues that there is sufficient evidence before the Court to support the existence of a contract in this case. He argues that if no writing singly satisfies the Statute of Frauds, a series of writings may collectively do so. *Id.* (citing *Kingsley v. Siebrecht*, 92 Me. 23, 33, 42 A. 249 (1898)). The Statute of Frauds requires that the writing contain "within itself, or by some reference to other written evidence ... all the essential terms of the contract, expressed with such reasonable certainty as may be understood from the memorandum and other written evidence referred to, (if any) without any aid from parol testimony." *Gagne v. Stevens*, 696 A.2d 411, 414 (Me.1997). In this case, the

only evidence of signed writings consists of: (1) an undated Contract for Sale of Real Estate signed by Plaintiff, stating the terms for the sale of the Southport property, and (2) the earnest money check, endorsed by Culver's attorney and deposited into an escrow account. Although the contract sets forth the specifics of the alleged agreement, it is not signed by either party to be charged. Defendant Culver has admitted to making the agreement, and Plaintiff argues that an exception to the Statute of Frauds arises when a party admits that a contract was formed. *See Paris Utility District v. A.C. Lawrence Leather Co., Inc.*, 665 F.Supp. 944, 956–57 (D.Me.1987) (Defendant's admission of facts necessary to the formation of an oral agreement precluded Defendant from relying on any Statute of Frauds defense). Culver admitted to having reached an agreement with Sutton, and he is, therefore, barred from raising a Statute of Frauds defense as to his agreement.

### Agency/Attorney–Client Relationship

Plaintiff argues that Winslow's acceptance of the earnest money check is sufficient to bind Rugan to the alleged agreement. Defendants deny that any agency relationship existed between Rugan and Winslow. Throughout the relevant time period, neither Sutton nor West ever asked if Winslow represented Sutton. No one ever told Sutton or West that Winslow represented Rugan. Sutton's attorney, Hylie West, simply assumed that Winslow represented both Culver and Rugan in the transaction. Tr. at 281. West testified that he developed this understanding from the following circumstances: (1) after nailing down the contract terms with Winslow, Winslow requested a $1,000 earnest money check, (2) three telephone calls in which Winslow indicated that the sellers would be coming by to sign the contract, and (3) the fact that the earnest money check was

deposited. Tr. at 281–82, 284. On cross-examination, West admitted that he had received "no expressed representations as to [Winslow's] authorization" to act on behalf of both Culver and Rugan. Tr. at 291–92. West also testified that his source of information regarding Rugan's willingness to go forward with the Sutton contract came from either Mangum or Winslow, not from Rugan, and further, that he had no knowledge that Winslow had ever met with Rugan. Tr. at 289, 291. In fact, Winslow never told West that he represented Rugan; rather, West testified: "[Winslow] told me that the sellers were fine with this contract. I took that to mean he represented both parties." Tr. at 289. West's assumption is not determinative of the issue.

In order to determine whether a lawyer-client relationship existed between Winslow and Rugan, the Court applies Maine law of agency. The Law Court has held that "an attorney-client relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance." *Board of Overseers of the Bar v. Mangan*, 763 A.2d 1189, 1192–93 (Me.2001) (internal quotations omitted). "An attorney-client relationship does not require the payment of a fee or formal retainer but may be implied from the conduct of the parties." *Board of Overseers of the Bar v. Dineen*, 500 A.2d 262, 264–65 (Me.1985) (internal quotations omitted). The law of principal and agent applies when a lawyer acts on behalf of a client, and "an attorney's actions of commission as well as omission are to be regarded as the acts of the party represented and ... any neglect of the attorney is equivalent to

that of the party." *Mockus v. Melanson,* 615 A.2d 245, 247 (Me.1992); *see also, Yaffie v. Lawyers Title Insurance Corp.,* 710 A.2d 886, 889 (Me.1998), *Berman v. Griggs,* 145 Me. 258, 75 A.2d 365, 367 (1950). Both Rugan and Winslow testified that Winslow was never Rugan's attorney and that Winslow was never authorized to act on Rugan's behalf. There is ample independent evidence supporting this conclusion.

Winslow understood that Rugan had divergent interests from Culver, and suggested that she get separate counsel if she thought it were necessary. Plaintiff and his wife Betty Sutton both understood from Rugan herself that she was going to consult separate counsel before agreeing to the deal. Sutton, an experienced seller and purchaser of real estate,[5] well understood that Rugan's express agreement and signature were necessary to complete any sale transaction. Plaintiff has not produced sufficient evidence to establish that Winslow was Rugan's agent. Since Winslow was never authorized to act as attorney on behalf of Rugan, his deposit of the earnest money check in the firm escrow account does not serve as the equivalent of a signed writing on behalf of Rugan. Accordingly, the Statute of Frauds is not satisfied.

Plaintiff argues that an exception to the Statute of Frauds applies in this case, *i.e.,* when the party to be charged agrees to make a writing that would satisfy the Statute of Frauds, the statute will not operate to bar enforcement of the oral contract. This exception is dependent upon a separate ancillary promise to make a sufficient writing. Plaintiff relies on *Landry v. Lan-*

*dry,* 641 A.2d 182 (Me.1994), where the Maine Law Court held that the Statute of Frauds did not bar enforcement of the oral contract between the parties where the plaintiff relied on the defendant's "representation that minor difficulties had prevented completion of the necessary documents for the ... property, but that the documents would be prepared and executed in the near future...." *Id.* at 183. *Landry* is distinguishable because there was partial performance of the contract wherein the parties completed the exchange of another parcel of land, which was contemplated as part of a deal that included the sale that was not executed.

Although Culver made an independent promise, his agreement is not at issue in this litigation. Moreover, the evidence at trial does not support the proposition that Rugan made any independent promise to sign. Rather, the evidence establishes that, in Rugan's telephone conversation with the Suttons on or about April 16, 2000, she stated that she would agree if her concerns were satisfied after speaking to her attorney. Both Plaintiff Joe Sutton's and his wife Betty Sutton's testimony support this version of events. Rugan admitted that she gave Plaintiffs the impression that she was generally in agreement, but she also told them that she still needed to speak to her attorney. There is absolutely no evidence of any unconditional promise at any time on Rugan's part to agree to the sale or to sign the contract.

In sum, there is insufficient evidence of an agreement for the sale of the property, and even if such an agreement was made, the Statute of Frauds bars its enforce-

---

**5.** Sutton testified that he had "bought and sold a large number of parcels of real property," owned properties in South America, Africa, and the United States including six farms, residential properties in Maine, Texas, and Prince Edward Island, and obtained through

purchase and sale agreements or lawsuits in excess of a dozen properties. Tr. at 90–91. West testified that he had handled "a couple of real estate transactions" for Sutton prior to the Southport deal. Tr. at 276.

ment. The Court will, therefore, deny Plaintiff's claim for breach of contract (Count I).

### Promissory Estoppel

■ Plaintiff claims that Defendant Rugan should be estopped from bringing a Statute of Frauds defense against enforcement of the alleged purchase and sale agreement. The Maine Law Court has defined the elements of a claim for promissory estoppel as follows:

> Promissory estoppel may be invoked when a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

*Gagne*, 696 A.2d at 416 (*quoting* RESTATEMENT § 90; *citing Chapman v. Bomann*, 381 A.2d 1123, 1127 (Me.1978)). As discussed above, Rugan made no promise specific enough to enforce. In the absence of an agreement by Rugan, the Court will not invoke promissory estoppel to prevent her from asserting the statute of frauds defense. Therefore, the Court will deny Plaintiff's claim for promissory estoppel (Count VIII).[6]

### Negligent Misrepresentation

Plaintiff contends that both Culver and Rugan are liable for negligent misrepresentation. Defendants deny these claims. Plaintiff does not specifically state what false information forms the bases of these claims. The parties agree that a claim for negligent misrepresentation consists of the following elements:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuni-

ary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Chapman v. Rideout*, 568 A.2d 829, 830 (Me.1990) (*quoting* RESTATEMENT (SECOND) OF TORTS § 552(1)). *See also Mott v. Lombard*, 655 A.2d 362 (Me. 1995) (counterclaim for negligent misrepresentation based on delay in removal of *lis pendens*).

### Misrepresentation by Culver

■ The evidence establishes that Culver falsely represented that he and Rugan would sell the property for $950,000 to Sutton. Culver testified that, in the spring of 2000, because he "was hoping [Rugan] would sign, ... [he] falsely represent[ed] the whole issue" of Rugan's approval when he told Sutton: "[W]e will sell you the property for $950,000." Tr. at 113–16. Culver also told Sutton that they would both be coming in to sign the contract, and Culver directed his secretary to call and inform Sutton that Culver was out of town and would be delayed in coming in to sign. Culver later told Winslow that he and Rugan would be coming in to sign the contract. Based on Culver's communication, Winslow conveyed to West the general approval by both Culver and Rugan of the terms of the contract as it had been drafted. West then conveyed to Sutton that Culver and Rugan would be coming in to sign the contract.

Plaintiff testified that he justifiably relied on the word of his own attorney, West, as well that of Culver's attorney, Winslow, both of whom had the understanding that

---

**6.** Since Plaintiff's claims for breach and promissory estoppel have been denied, the court will deny Plaintiff's claim for specific performance (Count III).

Culver and Rugan were "fine" with the contract as drawn up, and would be coming in to sign it. Although Culver did not misrepresent his own intention to sign the contract—the Court finds that he very much wanted to sell the property—Culver erred when he assured various parties that Rugan would be amenable to the deal. Culver negligently misrepresented Rugan's intentions on the following occasions: (1) his reinitiation of contract discussions with Sutton in early March, (2) his reassurances to Winslow in early April that he and Rugan would come in to sign the contract, (3) his reassurances to Sutton throughout April that he and Rugan would come in to sign the contract, and (4) his reassurances communicated to Sutton through his secretary that the delay was not cause for concern. The Court finds that Culver should have known throughout this period of time that Rugan had not agreed to sign the contract. Sutton testified that he relied on Culver's assurances that the contract would be executed by both Culver and Rugan, as sellers.

Although Sutton knew that Rugan had been reluctant to sell, the Court finds that Sutton reasonably relied on Culver's assertions to Sutton and, through Winslow, to West, that both Culver and Rugan were in agreement and planned to sign the contract. After Sutton's direct communication with Rugan, he knew that she was planning to talk to her own attorney, and he could have reasonably assumed that the meeting had taken place and that her concerns had been assuaged when he later heard from Culver that the deal was going forward. Although Sutton knew that Rugan had been reluctant to deal, Sutton's reliance on assertions from these several parties was justified. The Court concludes that Culver was negligent in permitting Sutton to rely on the assertions that the contract would be executed by Rugan.

## Rugan's Misrepresentation

Plaintiff also claims that Rugan is liable for negligent misrepresentation. He posits her liability on the theory that Culver was her agent, as well as on her own actions. The Court has already decided that Culver never acted as Rugan's agent, and therefore, she is not liable for his negligent misrepresentation. Plaintiff met Rugan on only one occasion, and he admitted that they did not talk about the sale of the property. Further, the Court has found that Rugan made no promise that she would sign the contract in her telephone conversation with Plaintiff on or about April 16, 2000, which is the only other direct contact that Plaintiff and Rugan had. Because Plaintiff has failed even to allege any negligent conduct by Rugan, the Court will deny Plaintiff's claim against Defendant Rugan for negligent misrepresentation.

## Damages

The relevant time period for calculating damages is the time between late March, when Plaintiff accepted Culver's counteroffer of $950,000 and hired an attorney to draft the contract, and on or about May 8, 2000, by which time Plaintiff: (1) had learned from Culver that the deal he thought he had made had fallen through, (2) had filed the Notice of Interest in Real Property, and (3) anticipated commencing litigation. During this time, Culver's negligence misled Plaintiff about his prospects for purchasing the property. Sutton learned, when he called West on April 24, 2000, that Defendants were negotiating with a new buyer and that the interest he believed he had was in jeopardy. Nevertheless, Culver continued to assure Sutton that the deal would go forward for nearly two weeks. Sutton learned, however, when he spoke to Culver on May 8, 2000, that Rugan was not in agreement

with the deal and that neither Culver nor Rugan were going to sign the contract. After May 8, 2000, therefore, it was no longer reasonable for Sutton to rely on Culver's false representation that they had a deal. The Court finds that the filing of this Complaint, the settlement negotiations, and the various costs incurred as a result of attempting to locate and purchase other properties are not shown to be based on reasonable reliance on Culver's misrepresentation about Rugan's agreement with the deal, by a preponderance of the evidence.[7]

Plaintiff contends that he incurred damages including: $1,000 in earnest money, $1,409 in attorneys' fees paid to West to draft the documents, and damages for the time period including when the Notice (*lis pendens*) was filed and thereafter. The Court will allow recovery of the earnest money deposit with interest to the date of judgment. The attorneys' fees to West, incurred in March and April 2000, are recoverable. *See* Ex. 40. The Court concludes that attorneys fees incurred after May 8, 2000, were not made in reasonable reliance on Culver's assertions that the alleged agreement would be executed.[8]

Plaintiff also claims damages for mental anguish. A claim for "severe or substantial mental suffering" requires objective evidence that plaintiff's mental distress is "so severe that no reasonable man could be expected to endure it." *Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 155 (Me.1979) (internal quotations omitted). There is simply no evidence that Plaintiff suffered severe mental anguish of the kind contemplated by Maine law during the relevant time period, therefore, the Court will deny Plaintiff's claim for emotional damages.

## Defendants' Counterclaims

Defendants claim that Plaintiff is liable to them for slander of title based on his actions in filing the notice of interest in real property in May 2000. In order to recover for slander of title, a plaintiff must prove four elements: (1) publication of a slanderous statement disparaging a claimant's title to an interest in land, (2) that the statement was false, (3) that the statement was made with malice or with reckless disregard of its falsity, and (4) that the statement caused actual damage. *See Pettee v. Young*, 783 A.2d 637, 642 (Me.2001). Sutton hired attorney Leonard

---

7. Plaintiff claims that he spent "an additional $6,000 to $15,000 in attorneys' fees trying to avoid having to file a lawsuit." Tr. at 73. Plaintiff further claims that, "after we had to initiate this lawsuit," he travelled at least 4000–6000 miles looking for other property, he incurred airplane fees, motel room charges, telephone bills and lost interest on earnest money paid on other deals that ended up not going through. Tr. at 81–82. Because the Court finds that Plaintiff's reliance on Culver's misrepresentations, during the time period after he learned from Culver that Rugan was not going to sign, was no longer reasonable, *supra*, the Court finds that Plaintiff has failed to establish sufficient proof that these expenses, including fees paid "to avoid" litigation, are connected to the legal problems specific to this piece of property so as to properly warrant compensation in this action.

8. Although the filing of the *lis pendens* on May 3, 2000 is within the applicable time period during which Plaintiff's reliance was justifiable, Plaintiff has simply not offered any adequate proof of a sum certain in damages for additional attorneys fees causally connected to the Plaintiff's reliance on the proven misrepresentations. Plaintiff's claim that he spent "an additional $6,000 to $15,000 in attorneys' fees" obviously encompasses time well beyond the May 8, 2000, end point of Plaintiff's reasonable reliance. Further, Plaintiff's proof of these fees is insufficiently fact-specific to permit the Court to formulate any decision as to their reasonableness or their connection to Plaintiff's reasonable reliance. *See Weinberger v. Great Northern Nekoosa Corp.*, 801 F.Supp. 804 (D.Me.1992).

Gulino to file a Notice of Interest in Real Property ("Notice") against the Southport property. Ex. 19, 23. Culver and Rugan argue that Sutton did this knowing that he had no interest in the property and with the intent to prohibit Defendants from validly transferring the property to another purchaser. Although the filing of the Notice meets elements 1, 2, and 4, Defendants have failed to establish that Sutton filed it with malice or reckless disregard of its falsity. Culver's negligence caused Sutton to reasonably rely for a few weeks in April on his assertions that the contract would imminently be executed, but by early May, Sutton should have suspected that his hopes of purchasing the Southport property had greatly diminished. Although he had learned of the existence of another potential buyer by this time, the Defendants have nonetheless failed to offer any evidence that he filed the Notice with any malicious intent. Moreover, Plaintiff pled legitimate and rational arguments for the existence of an agreement to sell the property. Plaintiff's actions were not made in reckless disregard for the truth of the claims. The Court will deny Defendants' Counterclaim for slander of title.[9]

### Plaintiff's Motions to Amend Pleadings and Reopen Evidence

Plaintiff has filed a post-trial motion to amend the pleadings to include the follow-

ing counts: (1) that Culver fraudulently attempted to convey his interest into a trust during the pendency of this lawsuit, (2) that Culver and Rugan fraudulently attempted to convey the Southport property to the Helmings, (3) for fraud and punitive damages, which were previously dismissed pursuant to Defendants' Rule 12(b)(6) motion for failure to plead with sufficient particularity, and (4) for intentional infliction of emotional distress. *See* Docket No. 43. Plaintiff has also filed a motion for limited reopening of the evidence in connection with the fraudulent conveyance claims. *See* Docket No. 44. Defendants have opposed Plaintiff's motions to amend and to reopen the evidence. *See* Docket No. 45.

Rule 15(a) provides that, after trial, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party...." Fed.R.Civ.P. 15(a) (2001). Since Defendants have not consented to any amendments, the Court will determine whether leave is appropriate in this case. Rule 15(b) permits the amendment of pleadings to conform to the evidence where "issues not raised by the pleadings are tried by express or implied consent of the parties." Fed.R.Civ.P. 15(b) (2001). Defendants did not give express consent to the trial of any issues regarding fraud.

---

**9.** Defendants have also counterclaimed for tortious interference with an economic relationship and/or contract and malice. In order to prove tortious interference with a contract or an advantageous economic relationship, a claimant must show either intimidation or fraud by a preponderance of the evidence. *See McGeechan v. Sherwood*, 760 A.2d 1068, 1081 (Me.2000), *(citing Petit v. Key Bank of Me.*, 688 A.2d 427, 430 (Me. 1996)). "If the claim is based on fraud, the claimant must also show that the claimant justifiably relied upon a false representation." *Id.* Defendants claim that Sutton's fil-

ing of the Notice interfered with the contract they later formed with the Helmings. The Court finds that Defendants have failed to demonstrate that Sutton committed any act of fraud or intimidation, or that they relied on any false representation made by Sutton. Defendants have similarly failed to show that Sutton undertook the filing of the Notice with malice towards them or that it was of such an outrageous nature and intended consequence that malice may be inferred therefrom. Accordingly, Defendants' counterclaims for tortious interference and malice will be dismissed.

Plaintiff argues that Defendants impliedly consented to the trial of the issues raised in his amendments. "Consent to the trial of an issue may be implied if, during the trial, a party acquiesces in the introduction of evidence which is relevant only to that issue." *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1172 (1st Cir.1995). Plaintiff relies, in part, on evidence of Culver's attempt to transfer his interest in the Southport property to a trust, which the Court admitted as Exhibit 44 over the objection by Defendants' counsel on grounds of relevancy and surprise. Tr. at 287. The Court admitted the evidence, stating that the document could be relevant "to establishing the status of the title for purposes of the Court framing a relief perhaps to be given in this case." Tr. at 287. Plaintiff's counsel moved to amend the pleadings to include claims for fraud, and argued that the evidence was also relevant to those issues. Tr. at 287–88, 296–97. Defendants' counsel objected to any amendment of the pleadings and to the admission of the evidence for that purpose. Tr. at 287–88, 297. The Court granted both parties the opportunity to file written motions briefing the issue of amendment, subject to a final ruling based on the merits. Tr. at 288, 296–97. Because the Court admitted Exhibit 44 for its potential use in determining appropriate relief and did not expressly admit it for its bearing on any claim of fraud, the Court here finds that Defendants did not impliedly consent to the admission of this evidence for the purpose of proving fraud.

In deciding whether to grant Plaintiff leave to amend, the Court examines each of Plaintiff's claims, in turn, to determine whether Defendants impliedly consented to the trial of these issues. Plaintiff argues the uncontested evidence at trial established Defendant Culver's intent to defraud Plaintiff. Even if the Court were inclined to grant leave to amend, Plaintiff has no standing to bring claims for fraudulent conveyance. In order to establish a claim for fraudulent conveyance under Maine's Uniform Fraudulent Transfers Act, a Plaintiff must establish that, *inter alia,* "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor... [w]ith actual intent to hinder, delay or defraud any creditor of the debtor...." 14 M.R.S.A. § 3575. Defendants own the Southport property and Sutton is not a creditor of the Defendants; therefore, as a matter of law, Defendants' attempts to dispose of the property by conveyance are not fraudulent *as to Sutton.* Further, these allegations are untimely and do not relate to any actions between the Defendants and Sutton, which originally gave rise to the lawsuit filed on July 11, 2000. Defendants signed a contract with the Helmings on July 24, 2000, and Culver's attempted conveyance to a trust occurred in August 2001. *See* Docket Nos. 43–45. The Court will deny Plaintiff's motion to include the claims for fraudulent conveyance, and, therefore, Plaintiff's motion (Docket No. 44) to reopen the evidence to support those claims is moot.

Plaintiff argues that his claims of fraud and punitive damages,[10] previously

10. Under Maine law, a person is liable for fraud if he: (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person justifiably relies on the representation as true and

acts upon it to the damage of the plaintiff. *See Fitzgerald v. Gamester,* 658 A.2d 1065, 1069 (Me.1995). "A plaintiff seeking punitive damages must show by clear and convincing evidence that the defendants' conduct was motivated by actual ill will, or that the conduct was so outrageous that malice is implied." *Id.* (internal citations omitted). The

dismissed for his failure to plead them with sufficient particularity, nevertheless should be revived. *See* Order Affirming the Recommend Decision of the Magistrate Judge (Docket No. 16) and Recommended Decision on Motion to Dismiss (Docket No. 12). Rule 9(b) requires that claims for fraud must be pled with particularity. Fed.R.Civ.P. 9(b). One of the interests served by this heightened pleading standard is "to place the defendants on notice and enable them to prepare meaningful responses." *Cutler v. F.D.I.C.,* 781 F.Supp. 816, 818 (D.Me.1992). Because Plaintiff's claims for fraud were properly and timely dismissed pursuant to Rule 12(b)(6), the Court concludes that prejudice to Defendants would result from the reassertion of counts for fraud at this late date, and Plaintiff's motion in this regard will be denied.

 Plaintiff's motion further argues that the evidence at trial proves that a claim of Intentional Infliction of Emotional Distress (IIED) was tried with Defendants' consent. In order to recover for the intentional infliction of emotional distress, a plaintiff must establish: (1) that the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct; (2) that defendant's conduct was so extreme and outrageous as to exceed all possible bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized community; (3) that defendant's actions caused plaintiff's emotional distress; and (4) that the emotional distress suffered by plaintiff was "so severe that no reasonable man could be expected to endure it." *Finn v. Lipman,* 526 A.2d 1380, 1382 (Me.1987). Plaintiff has failed to demonstrate any evidence of Defendants'

intent to inflict emotional distress or that Plaintiff, in fact, suffered any emotional distress. Nor does any evidence support the allegation that any conduct by Defendants was "extreme and outrageous." The Court, therefore, finds that Defendants did not consent to the trial of this issue, and the Court will deny Plaintiff's motion to include a claim for IIED.

## III. ORDER

It is, therefore, hereby **ORDERED** that:

(1) Plaintiff's claim for breach of contract is hereby **DENIED**;

(2) Plaintiff's claim for specific performance is hereby **DENIED**;

(3) Plaintiff's claim for negligent misrepresentation against Defendant Culver is hereby **GRANTED** in the amount of one thousand four hundred nine dollars ($1,409.00), representing West's reasonable attorneys' fees, and one thousand dollars ($1,000.00), representing the earnest money deposit, for a total of two thousand four hundred nine dollars ($2,409.00), plus interest;

(4) Plaintiff's claim for negligent misrepresentation against Defendant Rugan is hereby **DENIED**;

(5) Plaintiff's claim of promissory estoppel is hereby **DENIED**;

(6) Defendants' counterclaim for slander of title is hereby **DENIED**;

(7) Defendants' counterclaim for tortious interference is hereby **DENIED**;

(8) Defendants' counterclaim for malice is hereby **DENIED**;

(9) Plaintiff's Motion for Leave to Amend is hereby **DENIED**;

---

Court finds that Plaintiff failed to demonstrate at trial evidence demonstrating either actual ill will by Rugan or Culver or any conduct evincing malice.

**40**

(10) Plaintiff's Motion for Limited Re-
opening of the Evidence is hereby
**DENIED,**